1

2

3

4

5

6

7

8

9

10

11

12

13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DEJON PAYNE,

                                    Petitioner,          Case No. C19-0182-JLR-MAT

        v.

                                                          REPORT AND RECOMMENDATION

DANIEL WHITE,

                                    Respondent.

14

## INTRODUCTION AND SUMMARY CONCLUSION

15       Petitioner Dejon Payne is a state prisoner who is currently confined at the Washington

16   Corrections Center in Shelton, Washington.  He seeks relief under 28 U.S.C. § 2254 from a 2015

17   King County Superior Court judgment and sentence.  Respondent has filed an answer responding

18   to petitioner's federal habeas claims and has submitted relevant portions of the state court record.

19   Petitioner has not filed a response to respondent's answer, despite having been provided an

20   opportunity to do so.  This Court, having carefully reviewed petitioner's petition for writ of habeas

21   corpus, all briefing of the parties, and the state court record, concludes that the petition should be

22   denied and this action should be dismissed with prejudice.

23   / / /

REPORT AND RECOMMENDATION
PAGE - 1

FACTUAL BACKGROUND

Petitioner challenges in this action his conviction on a charge of first degree attempted murder with a firearm arising out of the shooting of Terrance Nicholson on New Year's Day 2014. The Washington Court of Appeals, on direct appeal, summarized the facts underlying petitioner's conviction as follows:

*Background*

Most of the parties and witnesses in this case lived, or spent considerable time, at the Ballinger Homes apartment complex in Shoreline. During the winter of 2013 to 2014, Nicholson was 34 years old. Nicholson was a local multi-sport athlete during high school and attended Shoreline Community College and the University of Central Florida where he graduated with a degree in business finance. Nicholson's best friend since childhood was Romell Liddell. Liddell's long-time girlfriend and mother of his two daughters, Vi Le, was a resident at Ballinger Homes. Although Liddell did not officially live at the complex, he spent most of his time there.

Nicholson and Liddell were also friends with several other people living in the area, including Kevin Nguyen[1] and his brother Hoang Nguyen. Another neighbor, Patric Heisser, lived with his girlfriend across the courtyard from Liddell and Le. He was acquainted with Liddell and Le but did not know them very well. Their daughters played together at the complex.

In the summer of 2013, Dejon Payne, a 29 year old from Los Angeles, started spending time at the Ballinger Homes complex and socializing regularly with Liddell, Nicholson, and their friends. They knew Payne only as "Young." Payne was staying in a nearby unit.

Later in the summer, Payne started displaying large amounts of cash and boasting of plans to buy an expensive sports car. Nicholson, Liddell, and some of their other friends, talked about stealing from Payne. In October 2013, Nicholson came home to find Liddell and a friend there with about $10,000 of Payne's cash, his cellphone, and some of his electronics. Liddell gave Nicholson some of the money.

On October 8, 2013, Payne contacted the police and reported that four days earlier he woke up in his friend's apartment at Ballinger Homes to see Nicholson

---

[1] [Court of Appeals footnote 1] To distinguish from his brother Hoang, Kevin Nguyen will be referred to as "Nguyen."

REPORT AND RECOMMENDATION
PAGE - 2

and another man leaving with his bag of cash and electronics. Payne was upset about the theft and wanted the police to find his property. Shortly after, Payne confronted Nicholson and accused him of taking the money. Nicholson said that he did not take the money and did not know what happened to it. After the theft, Nicholson testified that he would still see Payne around the Ballinger Homes complex but Payne no longer hung out with Nicholson, Liddell, or their other friends.

*The Shooting*

The shooting took place on January 1, 2014. Heisser testified that in the early afternoon, he looked out his window overlooking Le's apartment and saw Payne standing outside the building. Heisser did not know Payne personally, but recognized him because he had seen him around the complex many times. Heisser was unable to identify Payne in a pretrial photomontage as the man standing outside on the day of the shooting. However, at trial Heisser identified Payne as the man he had seen standing outside of Liddell and Le's apartment.

Heisser also testified that he saw Liddell leave his house about 10 minutes before the shooting and saw Liddell with Nguyen a few minutes before the shooting. Nguyen confirmed that before the shooting he and Liddell left the complex to visit a friend down the street. Nguyen also testified that he and Liddell saw Payne near the parking lot and talked to him briefly.

Shortly thereafter, Nicholson arrived at Le's residence to visit Liddell. Nicholson went around to a side door and knocked, but nobody answered. Nicholson soon noticed that Payne was standing behind him. After a brief conversation, Payne shot Nicholson in the stomach. The two wrestled for the gun, and another gunshot hit Nicholson in the thigh. Nicholson fell to the ground and Payne shot him four more times, six shots in total. Payne then ran from the area.

Hoang Nguyen testified that he heard someone say, "what's up man?" and then heard a series of gunshots. Hoang ran to Nicholson and saw a black man in a hooded jacket fleeing around the other side of the building, with no one else around. Hoang called 911 and stayed with Nicholson, who told him that "Young" had shot him.

Le testified that she heard the shots from inside the apartment and heard Nicholson's cry for help. She opened her door and found Nicholson on the ground. When she asked Nicholson who shot him, he said "Young." Liddell showed up a few minutes after the shooting and Nicholson told him "Young" had shot him. When police arrived, Nicholson also told a deputy that "Young" had shot him. The deputies immediately began searching for "Young," who they later identified as Payne.

REPORT AND RECOMMENDATION
PAGE - 3

Payne was eventually arrested in California on May 30, 2014. Payne was charged with attempted murder in the first degree with a firearm and assault in the first degree with a firearm.

*Cross-Examination of Kevin Nguyen*

Before calling Kevin Nguyen to testify, the State notified the trial court that it was attempting to arrange time for defense counsel to interview Nguyen "given that he has told Detective Bartlett that he has more helpful information for our case in the context of he has got pending charges." After interviewing Nguyen, Payne informed the court that Nguyen had a pending residential burglary charge, and that he told Detective Bartlett "that he would give her helpful information if she would give him a deal on the charge." Payne acknowledged that Detective Bartlett and the prosecutor informed Nguyen that a deal "wasn't going to happen." Payne informed the court that he intended to question Nguyen about his offer.

The trial court questioned the relevance: "If he is not getting any kind of offer from the State, I don't see how it is relevant that he has a charge. It is not readily admissible, and I don't see how it goes to bias if he doesn't have the predicate for bias." Payne replied that Nguyen told her "that if they gave him a deal, he would give some helpful information" and that "he would have just made something up." Payne argued that this went to his credibility—that "he will make up facts about his case in any way that's helpful to him." The trial court reiterated that Nguyen offered to give information in exchange for a deal, but "the deal was refused, there was no prospect for a deal, so it is not pertinent here, okay?" The court concluded "It is distracting, it is irrelevant, it is out."

During cross-examination, Payne attempted to impeach Nguyen's credibility by pointing out that he had previously told a defense investigator that he never saw Payne at the scene, and that he had never known anyone named "Young." Payne also asked Nguyen about a statement he allegedly made that "he was not sure which version [he was] going to say on the stand." Nguyen explained these statements by claiming he was scared for himself and his family, or simply denied having made them.

*Evidence of Payne's Arrest in California*

Before trial, Payne moved to exclude "all testimony that Payne was arrested in California and extradited back to face these charges" because it was not related to "fleeing or consciousness of guilt." Payne's trial brief specifically moved to exclude "testimony or argument that he 'fled' to California to avoid prosecution and that flight demonstrates consciousness of guilt."

The State replied that it intended to argue that Payne fled to California after the shooting. The State planned to support this argument with evidence that Payne

REPORT AND RECOMMENDATION
PAGE - 4

had been arrested in California four months after the shooting. There was evidence that Angel (Miranda) Olson, Payne's girlfriend and mother of his child, had been in Washington at the time of the shooting, used her debit cards in California a few days after the shooting. The inference being that Payne was probably with Olson at the time. The trial court believed evidence that Payne ran from the scene and "very shortly thereafter" relocated to California "could be" viewed as a deliberate effort to avoid arrest and prosecution, and "could be" is "all that's really needed for this to be admissible."

The trial court ruled the evidence was admissible as evidence of flight on the condition that the State was able to lay the foundation for the evidence by demonstrating a link between Payne and Olson and their shared child. Assuming the foundation was laid, the trial court limited the evidence of flight to: (1) Payne's behavior in running away and into a vehicle that left the scene, (2) where hotel records showed Olson was staying while the police were looking for Payne, (3) Olson's location after the shooting based on business records such as EBT transactions, and (4) where Payne was ultimately located at the time of his arrest.

Near the end of the State's case, Payne pointed out that the nexus between Payne and Olson had not been established. Payne sought to ensure that the testifying police officers were not going to "testify about the hotels." The State conceded that it was not "going to make that nexus," so it would not ask "anything in particular about Miranda Olson." Payne did not reiterate his request that the trial court exclude the evidence that Payne was arrested in California.

Later, the State asked Detective Bartlett, the State's final witness, about the police investigation:

[Prosecutor]: What was being done to try and find [Payne]?

[Bartlett]: There was a warrant placed, the case was charged, a warrant was placed out through NCIC, which is nationwide. So again, if anybody runs his name, that warrant would pop up.

[Prosecutor]: When was Mr. Payne arrested?

[Bartlett]: I believe it was December 19, 2014.

[Prosecutor]: Is that in your report?

[Bartlett]: No.

[Prosecutor]: Where was Mr. Payne arrested?

[Bartlett]: In California.

REPORT AND RECOMMENDATION
PAGE - 5

[Prosecutor]:  All right.  Are you certain about the date, or is that just a date that stuck out to you?

[Bartlett]:  Well I can't be certain without having the paperwork.

Report of Proceedings (RP) (May 4, 2015) at 317-18.  The State then rested.  Payne did not object to this testimony or cross-examine the witness on this issue.

*Verdict*

After deliberation, the jury convicted Payne of attempted murder in the first degree with a firearm and assault in the first degree with a firearm.  The trial court vacated the first degree assault conviction on double jeopardy grounds.

*Motion for New Trial Based on Allegations of Jury Misconduct*

During voir dire, the names of potential witnesses were read to the prospective jurors and the jurors were asked if they recognized any of the witnesses. Jurors 12 and 13 did not respond.  The trial court also advised, "[u]sually if you know somebody well enough to recognize them, you normally know their name too.  But I will tell you that if you spot someone that you know when they come in to testify, just let us know right away."

Nicholson began his testimony on April 29.  Nicholson testified that he went to three different local high schools and played "all sports," including "basketball, football, soccer, ran track."  He testified that he continued playing basketball at Shoreline Community College and the University of Central Florida.  Nicholson also testified that one of the reasons Liddell became his best friend was that Liddell's older brother taught Nicholson to play basketball.  Basketball was one of Liddell and Nicholson's primary activities at Ballinger Homes.

The day after Nicholson's testimony, the trial court informed the parties that juror 13:

Recognized Mr. Nicholson's high school, it's a high school she attended.  She didn't recognize Mr. Nicholson, didn't know Mr. Nicholson.  Her worry is if people who attended her high school show up, that she might recognize them.

The court then stated that it did not feel "concerned about this" and was not inclined to question the juror unless the parties wanted her to.  The trial court directed juror 13 to inform the court if she recognized anyone else.  Neither the State nor Payne objected or asked the court to further question juror 13.

REPORT AND RECOMMENDATION
PAGE - 6

After the verdict, Payne moved for a new trial based on juror misconduct.[2] Payne argued his right to a fair trial was violated because one of the jurors failed to disclose that he was personally acquainted with witness Patric Heisser and that he injected this information into the deliberations. Payne also argued that this new information, combined with juror 13's recognition of Nicholson, was sufficient to prejudice Nicholson [sic]. Payne supported his motion with a declaration from a defense investigator recounting a conversation with juror 4. According to the investigators [sic] declaration, Juror 4 stated, "[o]ne of the jurors recognized the witness, 'Patric' [Heisser] as someone with whom he had played basketball" and "[t]he second juror knew 'Terrence' [Nicholson] from high school" and "remembered 'Terrence' [Nicholson] as a star basketball player."

The trial court called juror 4 to testify. Before her testimony, the trial court indicated that with respect to the allegations about juror 13 knowing Nicholson,

> this is not news for any of us, because during the trial juror number 13 . . . disclosed that she knew Mr. Nicholson from high school. And my memory is that we specifically asked her about that outside the presence of the other jurors. She indicated it wouldn't affect her, and we agreed to keep her. So I'm not planning on inquiring more into that issue. It was explored during trial.

Payne did not object.

The trial court then proceeded to question juror 4. Juror 4 told the court that at the end of deliberation, while the jurors were discussing "whether or not we felt [the witnesses] were trustworthy in what they were saying," two jurors mentioned recognizing witnesses. According to juror 4, juror 13 said she knew of Nicholson from high school as a "super athlete" as being "this star, up and rising athlete person" and that Juror 13 said she was "surprised that this would happened to him." Juror 4 then said another juror "thought he remembered seeing Patric [Heisser] at a basketball game, and I can't remember if he said Patric [Heisser] was a coach or was somehow involved, but that that's where he thought he recognized him from." She claimed the juror said Heisser might have been a basketball coach, and if he was a coach, then he "has to be somewhat of a trustworthy person, like why would they lie." Juror 4 acknowledged that the other juror did not say he was sure whether Heisser was a coach. In addition, juror 4 did not recall the juror having mentioned interacting with Heisser at the time. She confirmed that both jurors stated that they did not think this recognition was playing into their judgment of the verdict.

After determining juror 12 was the juror that recognized Heisser, juror 12

---

[2] [Court of Appeals footnote 2] According to the investigators [sic] declaration, Juror 4 stated, "[o]ne of the jurors recognized the witness, "Patric" as someone with whom he had played basketball" and "[t]he second juror knew 'Terrance' [Nicholson] from high school" and "remembered 'Terrance' [Nicholson] as a star basketball player."

REPORT AND RECOMMENDATION
PAGE - 7

was called to testify. Juror 12 informed the court that he might have recognized one witness, explaining, "I don't know him. We all grew up in the Central District, so he was younger than me and I don't know him personally." He explained that he did not know Heisser as a basketball coach, but only that he may have seen him when he was younger and playing basketball and that was the only time he remembered seeing him. Juror 12 said that he mentioned recognizing Heisser while the jurors were discussing the witnesses' credibility, after juror 13 mentioned recognizing Nicholson. He reaffirmed that recognizing Heisser did not affect his, or any other jurors, assessment of credibility.

Payne maintained his motion for a new trial, arguing the two most important witnesses were recognized by jurors who interjected knowledge about them into deliberations. The trial court again declined to consider the question of juror 13 recognizing Nicholson because it had been resolved during trial. Payne did not object.

The trial court then explained:

I really don't know how [juror 12] could have acted any differently here . . . We ask jurors if they recognize any of the witnesses in the sense of recognizing their name, or having some acquaintanceship with them. Recognizing somebody you think is from your community, it seems to me, doesn't fall with [sic] the scope of our questions. So, I also am not clear that [juror 12] engaged in any misconduct at all by not revealing information that we asked him for. I don't know how he could have known that we wanted him to tell us if he saw anybody that he might, at some other point in his life, have seen but not interacted with in any way at all. The additional thing here, too, is I really don't think there is any evidence of juror misconduct involving use of extraneous evidence, not based on the testimony that [juror 4] gave us here, certainly not based on what [juror 12] has had to say here. There is no indication here that [juror 12], for example, brought a knowledge that Mr. Heiser or some acquaintanceship with him into deliberation and shared that with other jurors, which I agree would be definite evidence of misconduct, but we don't have anything like that here. We have, at most, it seems to me, [juror 12 and 13] saying, 'To the extent that we know these people,' and there is only [juror 13] who was really sure at all that she knew one of the witnesses, it had no impact on their assessment.

RP (July 24, 2015) at 422-23. Further,

I just don't see that [juror 12] did anything wrong by thinking he recognized somebody from something that some event in his

REPORT AND RECOMMENDATION
PAGE - 8

community some twenty years before this trial and indicated to other
jurors that had not played in to his assessment of credibility.

RP (July 24, 2015) at 423.

After finding that juror 4's testimony was not entirely consistent and that
juror 12 to be more credible, the court found Payne had not made a sufficient
showing for a new trial.

(Dkt. 12, Ex. 2 at 2-11.)

PROCEDURAL BACKGROUND

On September 18, 2015, petitioner was sentenced to a total term of 300 months

confinement which included a 60 month term for the firearm enhancement. (*Id.*, Ex. 1.) Petitioner

appealed his judgement and sentence to the Washington Court of Appeals and, on October 9, 2017,

the Court of Appeals issued an unpublished opinion affirming petitioner's conviction. (*See id.*,

Exs. 2-5.)

Petitioner thereafter filed a petition for review in the Washington Supreme Court. (*Id.*, Ex.

6.) Petitioner presented the following four issues to the Supreme Court for review:

1. Whether the trial court violated Payne's right to confront the
witnesses against him in ruling he could not impeach a State's witness, who placed
Payne at the scene of the shooting, with evidence that he faced a pending criminal
charge and expressed a willingness to lie on the stand?

2. Whether the trial court committed reversible error in admitting
evidence to show consciousness of guilt and, if so, did the loss of a pre-trial motion
to exclude the evidence preserve the error for review?

3. Whether the trial court erred in denying Payne's motion for a new
trial based on juror misconduct, where it was revealed that two jurors recognized
witnesses and injected that information into deliberations while discussing witness
credibility?

4. Whether cumulative error violated Payne's due process right to a
fair trial?

REPORT AND RECOMMENDATION
PAGE - 9

1   (*Id.*, Ex. 6 at 1.)  The Supreme Court denied review without comment on February 7, 2018.  (*Id.*,

2   Ex. 7.)  The Washington Court of Appeals issued its mandate terminating direct review on

3   February 23, 2018.  (*Id.*, Ex. 8.)  Petitioner now seeks federal habeas review of his conviction.

GROUNDS FOR RELIEF

Petitioner identifies the following four grounds for relief in his petition for writ of habeas

corpus:

1.   "DOES THE TRIAL COURT VIOLATE THE PETITIONER'S RIGHT TO CONFRONTATION BY PREVENTING HIM FROM CROSS-EXAMINING THE STATE'S WITNESS ABOUT A PENDING CRIMINAL CHARGE AND WILLINGNESS TO LIE ON THE STAND"

2.   "THE TRIAL COURT ERRED IN ADMITTING EVIDENCE TO SHOW CONSCIOUSNESS OF GUILT, WHILE THE COURT OF APPEALS DECISION ON WAIVER CONFLICTS WITH PRECEDENT"

3.   "WHETHER THE COURT ERROED [sic] IN DENYING A NEW TRIAL BASED ON JUROR MISCONDUCT PRESENTS A SIGNIFICANT QUESTION OF CONSTITUTIONAL LAW"

4.   "CUMULATIVE ERROR VIOLATED PAYNE'S DUE PROCESS RIGHT TO A FAIR TRIAL"

(*See* Dkt. 3 at 15, 17, 19, 21.)

DISCUSSION

Respondent argues that petitioner properly exhausted some, but not all, of his federal

habeas claims.  Specifically, respondent concedes that petitioner properly exhausted his first, third,

and fourth grounds for federal habeas relief by properly presenting the claims to the Washington

Supreme Court for review.  (*See* Dkt. 11.)  Respondent argues, however, that petitioner failed to

properly exhaust his second ground for relief because he failed to present the claim to the state

courts as a federal claim.  (*Id.*)  Finally, respondent argues that the state court reasonably rejected

petitioner's exhausted claims on direct appeal.  (*See id.*)

REPORT AND RECOMMENDATION
PAGE - 10

<u>Exhaustion and Procedural Default</u>

A state prisoner is required to exhaust all available state court remedies before seeking a federal writ of habeas corpus. 28 U.S.C. § 2254(b)(1). The exhaustion requirement is a matter of comity, intended to afford the state courts "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citations omitted). In order to provide the state courts with the requisite "opportunity" to consider his federal claims, a prisoner must "fairly present" his claims to each appropriate state court for review, including a state supreme court with powers of discretionary review. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995), and *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

In order to "fairly present" a federal claim to the state courts, a petitioner must alert the state courts to the fact that he is raising a federal constitutional claim. *Hivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) (citing *Duncan*, 513 U.S. at 365-66). "If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court." *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996). Moreover, "general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion." *Hivala*, 195 F.3d at 1106 (citing *Gray v. Netherland*, 518 U.S. 152, 163 (1996)).

Petitioner asserts in his second ground for federal habeas relief that the trial court erred in admitting evidence that petitioner was arrested in California after the shooting because the evidence did not show consciousness of guilt. (*See* Dkt. 3 at 17-19.) Respondent argues that petitioner failed to properly exhaust this claim because he presented the claim to the Washington Supreme Court as an issue of only state law. (Dkt. 11 at 13.) The record confirms that petitioner

REPORT AND RECOMMENDATION
PAGE - 11

presented his second ground for relief to both the Washington Court of Appeals and the Washington Supreme Court as a claim implicating only state law concerns. (*See* Dkt. 12, Ex. 3 at 23-31 and Ex. 6 at 11-15.)  At no time did petitioner identify any federal constitutional basis for his claim in proceedings before the state courts. (*See id.*)  Petitioner therefore failed to properly exhaust his second ground for relief.

When a petitioner fails to properly exhaust his state court remedies and the court to which petitioner would be required to present his claims in order to satisfy the exhaustion requirement would now find the claims to be procedurally barred, there is a procedural default for purposes of federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991).  Respondent argues that petitioner, having failed to properly exhaust his second ground for relief, would now be barred from presenting the claim to the state courts under the Washington time bar statute, RCW 10.73.090.  RCW 10.73.090(1) provides that a petition for collateral attack on a judgment and sentence in a criminal case must be filed within one year after the judgment becomes final. Petitioner's judgment became final for purposes of state law on February 23, 2018, the date the Court of Appeals issued its mandate terminating direct review.  It therefore appears clear that petitioner would now be time barred from returning to the state courts to present his unexhausted claim.

When a state prisoner defaults on a federal claim in state court, pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

To satisfy the "cause" prong of the cause and prejudice standard, petitioner must show that

REPORT AND RECOMMENDATION
PAGE - 12

some objective factor external to the defense prevented him from complying with the state's procedural rule.  *Id*. at 753 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  To show "prejudice," the petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).  Only in an "extraordinary case" may the habeas court grant the writ without a showing of cause or prejudice to correct a "fundamental miscarriage of justice" where a constitutional violation has resulted in the conviction of a defendant who is actually innocent.  *Murray*, 477 U.S. at 495-96.

Petitioner makes no effort to demonstrate cause and prejudice or actual innocence. He therefore fails to demonstrate that his procedurally defaulted claim is eligible for federal habeas review.  Accordingly, this Court recommends that petitioner's federal habeas petition be denied with respect to his second ground for relief.

<u>Standard of Review for Exhausted Claims</u>

Federal habeas corpus relief is available only to a person "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d). Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially

REPORT AND RECOMMENDATION
PAGE - 13

1    indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).   Under the

2    "unreasonable application" clause, a federal habeas court may grant the writ only if the state court

3    identifies the correct governing legal principle from the Supreme Court's decisions, but

4    unreasonably applies that principle to the facts of the prisoner's case. *See id*. at 407-09.

5         The Supreme Court has made clear that a state court's decision may be overturned only if

6    the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).   The

7    Supreme Court has also explained that "[a] state court's determination that a claim lacks merit

8    precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

9    the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (citing *Yarborough v.*

10   *Alvarado*, 541 U.S. 652, 664 (2004)).

11        Clearly established federal law means "the governing legal principle or principles set forth

12   by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-

13   72.   "If no Supreme Court precedent creates clearly established federal law relating to the legal

14   issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or

15   an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955

16   (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

17        In considering a habeas petition, this Court's review "is limited to the record that was

18   before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170,

19   181-82 (2011).   If a habeas petitioner challenges the determination of a factual issue by a state

20   court, such determination shall be presumed correct, and the applicant has the burden of rebutting

21   the presumption of correctness by clear and convincing evidence.   28 U.S.C. § 2254(e)(1).

22                          <u>Ground One:  Confrontation Clause</u>

23        Petitioner asserts in his first ground for relief that the trial court violated his right to

REPORT AND RECOMMENDATION
PAGE - 14

confront witnesses against him when it prohibited the defense from cross-examining a state's witness about a pending criminal charge and his willingness to lie on the stand.  (Dkt. 3 at 15.) More specifically, petitioner asserts that his defense counsel wanted to question prosecution witness Kevin Nguyen about a pending residential burglary charge because Mr. Nguyen said in an interview before taking the stand that he would reveal information helpful to the prosecution if he received a deal on the pending charge, and that he "would have made something up" if a deal had been reached.  (*Id*. at 16.)  The trial court prohibited the defense from cross-examining Mr. Nguyen about the pending charge, ruling that the evidence was irrelevant and distracting because there was no bias in the absence of an actual deal.  (*Id*.)

The Confrontation Clause of the Sixth Amendment secures for the criminal defendant the right to cross-examine a witness against him in order to test the believability of the witness.  *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974).  As the Court recognized in *Davis*, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."  *Id*. at 316-17.  Nonetheless, the right to cross-examination is not without limits.  Trial courts have broad discretion to impose limits on cross-examination, based on evidentiary concerns such as those embodied in the Federal Rules of Evidence, including relevancy, harassment, prejudice, delay, duplicity, or confusion of the issues.  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

On federal habeas review, even if an error of constitutional dimension is established, a petitioner is entitled to relief only if he can demonstrate that the error resulted in actual prejudice. *Davis v. Ayala*, 135 S. Ct. 2187, 2198-99 (2015); *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).  This standard is satisfied if the record raises "grave doubt[s]" about whether the error influenced the jury's decision.  *Ayala*, 135 S. Ct. at 2203 (2015) (quoting *O'Neal v. McAninch*, 513

U.S. 432, 436 (1995)).

The Washington Court of Appeals rejected petitioner's claim that he was denied his right to confrontation and to present a defense, explaining its conclusion as follows:

> Payne argues first that the trial court's decision to prohibit cross-examination of Nguyen concerning his pending criminal charge violated Payne's Sixth Amendment right to confrontation and to present a defense. Payne contends that evidence of a witnesses' bias is always admissible. But here, even if there was error, any error was harmless because the untainted evidence supports a finding of guilt beyond a reasonable doubt.
>
> A trial court's decision to exclude evidence is generally reviewed for abuse of discretion. State v. Gunderson, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). But constitutional issues, such as claimed violations of a defendant's Sixth Amendment right to present a defense, are reviewed de novo. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010); State v. Strizheus, 163 Wn. App. 820, 829, 262 P.3d 100 (2011).
>
> The Sixth Amendment and due process require an accused be given a meaningful opportunity to present a complete defense. State v. Cayetano-Jaimes, 190 Wn. App. 286, 295-98, 359 P.3d 919 (2015); U.S. Const. amend. V, VI, XIV; Const. art. I, §3, §22. In conjunction with the right to present a defense, defendants have the constitutional right to confront the witnesses against them. State v. Hudlow, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983). The primary interest secured by the confrontation clause is the right of cross-examination. Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974). The defendant's right to impeach a prosecution witness with evidence of bias "is guaranteed by the constitutional right to confront witnesses." State v. Johnson, 90 Wn. App. 54, 69, 950 P.2d 981 (1998); Davis, 415 U.S. at 316-318.[3]
>
> In Davis, for example, the State's primary witness was a juvenile on probation. Davis, 415 U.S. at 318. The trial court denied the defense's request to question the witness about whether being on probation, or fear of becoming a suspect, may have motivated him to identify the defendant. Davis, 415 U.S. at 318. The Supreme Court reversed the conviction and remanded the case, holding, "[t]he accuracy and truthfulness of [the witness's] testimony were key elements in the State's case against petitioner" and the trial court's ruling kept defense counsel from effectively arguing "why [the witness] might have been biased or otherwise lacked that degree of impartiality expected." Davis, 415 U.S. at 317-18.

---

[3] [Court of Appeals footnote 3] Bias refers to "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." United States v. Abel, 469 U.S. 45, 52, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984).

REPORT AND RECOMMENDATION
PAGE - 16

The State argues that we do not need to decide whether the trial court erred in precluding evidence of Nguyen's pending conviction, because any error was harmless. We agree. "It is well established that constitutional error, including violations of a defendant's rights under the confrontation clause, may be so insignificant as to be harmless." State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985).

Constitutional error is presumed to be prejudicial and the State has the burden of proving the error was harmless. Guloy, 104 Wn.2d at 425. A constitutional error is harmless "if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." Guloy, 104 Wn.2d at 425. We apply the "overwhelming untainted evidence test," meaning we look "only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily lead[s] to a finding of guilt." Guloy, 104 Wn.2d at 426.

First, unlike Davis, Nguyen's testimony was not "a crucial link in the proof . . . of petitioner's act." Davis, 415 U.S. at 317 (quoting Douglas v. Alabama, 380 U.S. 415, 417, 85 S. Ct. 1074[,] 13 L. Ed. 2d 934 (1965). Nguyen was not the sole link between the defendant and the crime. Davis, 415 U.S. at 317-18. Nguyen did not witness the shooting. Nor did he hear Nicholson's three statements to three individuals, including a police officer, that Payne was the shooter.

Second, the majority of Nguyen's testimony—that Payne was upset about the theft of his money, that Payne was present at Ballinger Homes minutes before the shooting, and that Liddell had left the area prior to the shooting—was cumulative and corroborated by other witnesses. Nicholson testified that Payne was upset about the theft and confronted him. A police officer testified that Payne contacted them to report that Nicholson and another individual were responsible for the theft of his money and property as [sic] was upset about it. Similarly Heisser testified that he had seen Payne standing outside of Le and Liddell's apartment— where Nicholson was shot.[4] Heisser also confirmed that Liddell had left the area prior to the shooting.

Finally, it bears repeating that Nicholson testified at trial that Payne was the shooter, and repeatedly and unequivocally told several witnesses right after the shooting that he was shot by Payne—a man he knew quite well. Even disregarding Nguyen's testimony, the untainted evidence still overwhelmingly supports the

---

[4] [Court of Appeals footnote 4] Payne argues that Heisser was unreliable because he failed to pick Payne out of a photo montage. But the trial court also studied the photo montage and remarked "Actually, I am having trouble picking out Mr. Payne from this." The court added "I have to say it would be hard for me to pick out Mr. Payne, and I have been looking at him a whole lot. The court concluded "I don't see any reason why, seeing Mr. Payne in the flesh, [Heisser] wouldn't be credible in recognizing him again here in court."

REPORT AND RECOMMENDATION
PAGE - 17

1    jury's finding of guilt.

2    (Dkt. 12, Ex. 2 at 12-15.)

3        A reviewing court, under the Antiterrorism and Effective Death Penalty Act ("AEDPA"),

4    must accord deference to a state's harmless error determination. And, as noted above, a petitioner

5    must satisfy the *Brecht* prejudice test in order to obtain federal habeas relief. The Supreme Court

6    has explained that when a petitioner contests a state court's determination that a constitutional

7    error was harmless, "the *Brecht* test subsumes the limitations imposed by AEDPA." *Ayala*, 135

8    S. Ct. at 2199 (citing *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007)). Thus, the inquiry here is whether,

9    in light of the record as a whole, precluding evidence of Kevin Nguyen's pending criminal charge

10   substantially influenced the verdict. *See Brecht*, 507 U.S. at 638–39. Petitioner makes no showing

11   that it did.

12       This Court's review of the record confirms the Washington Court of Appeals' conclusion

13   that the overwhelming untainted evidence in the record supports the jury's finding of guilt. As the

14   Court of Appeals correctly noted, Mr. Nguyen did not witness the shooting, his testimony was

15   largely cumulative of, and corroborated by, the testimony of other prosecution witnesses, the

16   victim, Terrance Nicholson, testified at trial that petitioner was the shooter, and several other

17   witnesses testified that Mr. Nicholson told them immediately after the shooting that petitioner was

18   the person who shot him. There is simply nothing in the record before this Court demonstrating

19   that the trial court's decision to prohibit cross-examination of Mr. Nguyen concerning an unrelated

20   pending criminal charge had a "substantial and injurious effect or influence in determining the

21   jury's verdict." Petitioner's federal habeas petition should therefore be denied with respect to his

22   first ground for relief.

23   / / /

REPORT AND RECOMMENDATION
PAGE - 18

1

Ground Three:  Juror Misconduct

2

Petitioner asserts in his third ground for relief that the trial court erred in denying his request

3 for a new trial based on juror misconduct involving jurors 12 and 13.  (Dkt. 3 at 19.)  Petitioner

4 complains that these jurors recognized two prosecution witnesses at trial, Mr. Heisser and Mr.

5 Nicholson respectively, and that the jurors injected extrinsic evidence into the deliberations based

6 on their familiarity with these witnesses.  (*See id*. at 19-21.)

7

It is well established that a criminal defendant has a right to a trial before "a panel of

8 impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961).  Where allegations

9 of juror impartiality are made, the remedy is to provide "a hearing in which the defendant has the

10 opportunity to prove actual bias."  *Smith v. Phillips*, 455 U.S. 209, 215 (1982).  The Supreme

11 Court, in *Smith*, explained that "due process does not require a new trial every time a juror has

12 been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield

13 jurors from every contact or influence that might theoretically affect their vote."  *Id*. at 217.  Rather,

14 "[d]ue process means a jury capable and willing to decide the case solely on the evidence before

15 it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of

16 such occurrences when they happen."  *Id*.; *Rushen v. Spain*, 464 U.S. 114, 118 (1983).

17

The burden is on the defendant to establish that a juror lacks impartiality.  *See Wainwright*

18 *v. Witt*, 469 U.S. 412, 423 (1985).  In evaluating a claim of juror impartiality, deference must be

19 paid to a state trial judge's determination of bias.  *See id*. at 426.  As the Court noted in *Wainwright*,

20 a finding on whether a juror is biased "is based upon determinations of credibility that are

21 peculiarly within a trial judge's province."  *Id*. at 428.  Such determinations regarding juror

22 impartiality constitute "factual issues" which are subject to the presumption of correctness set forth

23 in § 2254(e)(1).  *See id*. at 429.

REPORT AND RECOMMENDATION
PAGE - 19

The Washington Court of Appeals rejected petitioner's jury misconduct claim, explaining its conclusion as follows:

> The decision whether juror misconduct occurred and whether it affected the verdict are matters for the discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. Breckenridge v. Valley Gen. Hosp., 150 Wn.2d 197, 203, 75 P.3d 944 (2003). "A trial court only abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." Richards v. Overlake Hosp. Med. Ctr., 59 Wn. App. 266, 271, 796 P.2d 737 (199). "A party who asserts juror misconduct bears the burden of showing it occurred." State v. Kell, 101 Wn. App. 619, 621, 5 P.3d 47 (2000). "A strong, affirmative showing of misconduct is necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank, and free discussion of evidence by the jury." State v. Balisok, 123 Wn.2d 114, 117-18, 866 P.2d 631 (1994).
>
> "While great deference is due the trial court's determination that no prejudice occurred, greater deference is owed a decision to grant a new trial than a decision not to grant a new trial." State v. Briggs, 55 Wn. App. 44, 60, 776 P.2d 1347 (1989). "The test to determine whether the verdict may be impeached and a new trial warranted is first whether the alleged information actually constituted misconduct, and, if misconduct did occur, whether it affected the verdict." Richards, 59 Wn. App. at 270. "The injection of information by a juror to fellow jurors, which is outside the recorded evidence of the trial and not subject to the protections and limitations of open court proceedings, constitutes juror misconduct." Richards, 59 Wn. App. at 270. Once the court finds misconduct, the court must make an objective inquiry into whether the extraneous evidence could have affected the jury's determination. Briggs, 55 Wn. App. at 55. "Any doubt that the misconduct affected the verdict must be resolved against the verdict." Richards, 59 Wn. App. at 273. "[A] new trial must be granted unless it can be concluded 'beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict.'" United States v. Bagley, 641 F.2d 1235, 1242 (9th Cir. 1981) (quoting Gibson v. Clanon, 633 F.2d 851, 855 (9th Cir. 1980)).
>
> Payne contends that jurors 12 and 13 both failed to disclose information during voir dire, constituting misconduct. Payne does not argue that the failure to disclose alone was sufficient to demonstrate reversible misconduct.[5] Instead, Payne argues that their nondisclosure is reversible error because they withheld

---

[5] [Court of Appeals footnote 6] To obtain a new trial based on juror nondisclosure, a party must show that the juror failed to honestly answer a material question during voir dire and that a truthful disclosure would have provided a basis for a challenge for cause. State v. Cho, 108 Wn. App. 315, 321, 30 P.3d 496 (2001). A juror's acquaintance with a party, by itself, is not grounds for a challenge for cause. See State v. Tingdale, 117 Wn.2d 595, 601, 817 P.2d 850 (1991).

REPORT AND RECOMMENDATION
PAGE - 20

material information and then later injected that information into deliberations. Thus, this court "must inquire into the prejudicial effect of the combined, as well as the individual, aspects of the juror's misconduct." See Briggs, 55 Wn. App. at 53.

In this case, the trial court acknowledged, and the State reiterated on appeal, that most of the facts presented by juror 4 and juror 12 inhered to the verdict.[6] The only reviewable facts that could go to misconduct are that juror 13 might have stated that Nicholson was a star athlete in high school and that juror 12 may have seen Heisser in the community, possible related to basketball.

Payne points to several cases in which the appellate court remanded for a new trial after finding juror misconduct. See Allyn v. Boe, 87 Wn. App. 722, 730-31, 943 P.2d 364 (1997); Robinson v. Safeway Stores, Inc., 113 Wn.2d 154, 158, 776 P.2d 676 (1989), Allison v. Dep't of Labor & Indus., 66 Wn.2d 263, 265, 401 P.2d 982 (1965).[7] The common theme in these cases is that the juror failed to disclose bias to the court, often intentionally, and then injected that bias into the deliberations. In this case, the record does not present any evidence that either juror falsely stated that they did not recognize the witness, or injected bias into deliberations.

The record indicates that Juror 13 only recognized Nicholson when he began testifying, and she realized she had gone to the same high school. There is no evidence that she knew Nicholson personally, only by reputation. Juror 13 decided to inform the court of this connection at the time and said that she could still be impartial. Knowing this, the defense chose not to further question juror 13 regarding her disclosure, and agreed to retain her on the panel. While there is no evidence that juror 13 told the court that she had heard of Nicholson, this was an easily foreseeable possibility given that she attended the same school. Juror 13's disclosure gave the parties an indication of her life experience and the knowledge she would bring to jury deliberations.

Juror 13 also did not insert extrinsic evidence. During deliberations, Juror 13 referred to Nicholson as a "star" and a "super athlete." Neither of these

---

[6] [Court of Appeals footnote 7] In considering an allegation of juror misconduct based on the injection of novel extrinsic evidence, the first question is whether the facts alleged "inhere in the verdict"; a question of law we review de novo. Long v. Brusco Tug & Barge, Inc., 185 Wn.2d 127, 131, 368 P.3d 478 (2016). Only once the court concludes that juror declarations allege facts constituting misconduct, rather than matters inhering in the verdict, does it proceed to decide the effect the misconduct, if any, could have had upon the jury. Long, 185 Wn.2d at 132.

[7] [Court of Appeals footnote 8] In Boe, the court held that a new trial was necessary because a juror failed to inform the court about her bias against an expert witness, then attacked that witness's credibility during deliberations. Boe, 87 Wn. App. at 730-31. Similarly, in Robinson, the court held that a juror's failure to disclose his bias against California residents constituted juror misconduct because the plaintiff was from California. Robinson, 113 Wn.2d at 154. Finally, in Allison, the court granted a new trial because the juror falsely stated that he could be fair and impartial. Allison, 66 Wn.2d at 265.

statements indicate bias, or constitutes new or novel extrinsic evidence. At trial, Nicholson testified that he played basketball in high school, and continued playing for a college team. A player on a high school team that goes on to play college basketball would presumably be an accomplished athlete and could reasonably be well-known throughout the school.

Juror 12 also did not falsely withhold information when he failed to inform the trial court that he had recognized Heisser. The trial court instructed the jurors to inform the court "if you spot someone that you know when they come in to testify,"[8] and juror 12 testified that he had never known or interacted with Heisser. Juror 12 stated only that he may have seen Heisser once or twice in the community of the Central District. Such limited contact is not "knowing" a witness, and would likely not have caused juror 12 to assume he needed to notify the court.

Juror 12 also did not inject extrinsic evidence into the deliberations. Juror 4 testified that juror 12 might have said if Heisser had been a coach he would probably be trustworthy. Juror 12, on the other hand, specifically testified that he had not recognized Heisser as a coach. The trial court found that juror 4's testimony was inconsistent with and unreliable compared to juror 12. Determinations of credibility are within the discretion of the trial court, and we defer to the trier of fact in matters of credibility. Juror 12 telling the other jurors he may have seen Heisser in the Central District as a youth was not novel extrinsic evidence, as Heisser testified directly that he grew up in Seattle's Central District.

The trial court did not abuse its discretion in denying Payne's motion for retrial based on jury misconduct.

(Dkt. 12, Ex. 2 at 18-22.)

Petitioner fails to demonstrate that this conclusion of the Washington Court of Appeals with respect to his juror misconduct claim is contrary to, or constitutes an unreasonable application of, United States Supreme Court precedent. The trial court appropriately held a hearing providing petitioner an opportunity to prove actual bias and, after taking testimony and hearing argument, determined that petitioner had not made the showing necessary to warrant a new trial. The Court of Appeals, in evaluating the record created by the trial court, reasonably concluded that the jurors

---

[8] [Court of Appeals footnote 9] Emphasis added.

REPORT AND RECOMMENDATION
PAGE - 22

1   in question did not provide materially false information during voir dire, did not inject extrinsic

2   evidence into the deliberations, and did not show any actual bias.

3        The record makes clear that neither juror recognized the names of the witnesses when they

4   were identified during voir dire, recognizing the witnesses only once they appeared to testify.  The

5   record also makes clear that the jurors had no past personal interactions with the witnesses and

6   extremely limited knowledge about them.  Finally, the record makes clear that neither juror

7   introduced any extrinsic evidence into the jury deliberations, essentially noting only that they knew

8   of, or recognized, the witnesses from the distant past, and both jurors affirmed during deliberations

9   that they did not believe this recognition affected their judgment regarding the verdict.  This Court

10  therefore concludes that the state court reasonably rejected petitioner's claim that he was denied

11  the right to an impartial jury based on the alleged misconduct of jurors 12 and 13.  Petitioner's

12  federal habeas petition should therefore be denied with respect to his third ground for relief.

13                              Ground Four:  Cumulative Error

14       Petitioner asserts in his fourth ground for relief that the cumulative effect of the errors

15  alleged in his petition violated his due process right to a fair trial.  (Dkt. 3 at 7-8.)  Even where no

16  single error rises to the level of a constitutional violation, "the combined effect of multiple trial

17  court errors violates due process where it renders the resulting criminal trial fundamentally unfair."

18  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).

19       The Washington Court of Appeals rejected petitioner's cumulative error claim, explaining

20  its conclusion as follows:

21            Payne's final argument is that the accumulation of the errors affected the
         outcome in his case.  Under the cumulative error doctrine, a defendant may be

22       entitled to a new trial when cumulative errors produce a trial that is fundamentally
         unfair.  In re Pers. Restraint of Lord, 123 Wn.2d 296, 332, 868 P.2d 835 (1994).

23       Cumulative error may warrant reversal, even if each error standing alone would

REPORT AND RECOMMENDATION
PAGE - 23

otherwise be considered harmless. State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d
390 (2000). "The doctrine does not apply where the errors are few and have little
or no effect on the outcome of the trial." State v. Weber, 159 Wn.2d 252, 279, 149
P.3d 646 (2006).

As discussed above, the only error Payne might have successfully alleged
is the trial court's error in not permitting Payne to cross-examine Nguyen on his
potential bias, and we already found that to be harmless error. Payne has not
demonstrated any other errors. The cumulative error doctrine does not apply in this
case.

(Dkt. 12, Ex. 2 at 22-23.)

The state court reasonably rejected petitioner's cumulative error claim. Petitioner has  has

not established that there were multiple errors at his trial and, thus any claim that the accumulation

of errors requires reversal of his conviction necessarily fails. Petitioner's federal habeas petition

should therefore be denied with respect to his fourth ground for relief.

## Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA)

from a district or circuit judge. A certificate of appealability may issue only where a petitioner has

made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A

petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the

district court's resolution of his constitutional claims or that jurists could conclude the issues

presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537

U.S. 322, 327 (2003). Under this standard, this Court concludes that petitioner is not entitled to a

certificate of appealability with respect to any of the claims asserted in his petition.

## CONCLUSION

Based on the foregoing, this Court recommends that petitioner's petition for writ of habeas

REPORT AND RECOMMENDATION
PAGE - 24

1    corpus be denied and that this action be dismissed with prejudice.  This Court also recommends

2    that a certificate of appealability be denied with respect to all claims asserted in this federal habeas

3    action.  A proposed order accompanies this Report and Recommendation.

                                         OBJECTIONS

5        Objections to this Report and Recommendation, if any, should be filed with the Clerk and

6    served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report

7    and Recommendation is signed.  Failure to file objections within the specified time may affect

8    your right to appeal.  Objections should be noted for consideration on the District Judge's motions

9    calendar for the third Friday after they are filed.  Responses to objections may be filed within

10   **fourteen (14) days** after service of objections.  If no timely objections are filed, the matter will be

11   ready for consideration by the District Judge on **September 27, 2019**.

12       DATED this 30th day of August, 2019.

13

14   _____
     Mary Alice Theiler

15   United States Magistrate Judge

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION
PAGE - 25